IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVIE BOYD, | : | Civil No. 3:16-cv-1262 |
| | : | |
| Plaintiff | : | (Judge Mariani) |
| | : | |
| v. | : | |
| | : | |
| DOCTOR JOHN LISIAK, | : | |
| DOCTOR HARESH PANDYA, | : | |
| NELSON IANNUZZI, | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM

### I.  Background

Plaintiff Stevie Boyd, an inmate who, at all relevant times, was housed at the

Frackville State Correctional Institution ("SCI-Frackville"), and the Mahanoy State

Correctional Institution ("SCI-Mahanoy"), initiated the above-captioned civil rights action

pursuant to 42 U.S.C. § 1983. (Doc. 1). The named Defendants are Dr. Haresh Pandya,

Dr. John Lisiak, and Nelson Iannuzzi, CRNP. (Id. at pp. 2, 5-6). Boyd alleges that

Defendants were deliberately indifferent to his serious medical needs by failing to properly

treat his thyroid condition. (Doc. 1).

Presently pending before the Court is Defendants' motion to dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment

pursuant to Federal Rule of Civil Procedure 56. (Doc. 12). Boyd filed a brief in opposition

to Defendants' motion. (Doc. 15). Accordingly, the motion is ripe for disposition, and for the

following reasons, the Court will grant the motion for summary judgment.

## II.    Summary Judgment Standard of Review

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court

2

need consider only the cited materials, but it may consider other materials in the record."

FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the

non-moving party, and where the non-moving party's evidence contradicts the movant's,

then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am.,*

*Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127

S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the

summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts. Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial. The mere existence of some alleged factual dispute between
> the parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no genuine issue of
> material fact. When opposing parties tell two different stories, one of which is
> blatantly contradicted by the record, so that no reasonable jury could believe
> it, a court should not adopt that version of the facts for purposes of ruling on a
> motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## III. Statement of Undisputed Facts[1]

___

[1]     Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil
Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered
paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF
COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material
facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying

3

In June 2012, Boyd's routine blood work revealed low TSH levels, which was indicative of hyperthyroidism. (Doc. 13, ¶ 4). Dr. Lisiak explained this diagnosis to Boyd, and advised him that his hyperthyroidism was being followed by labs and that he would undergo ultrasounds every six months to follow the growth, if any, of his thyroid nodule. (*Id.*; Doc. 14-1, p. 287).

One week after being advised of his diagnosis, Boyd presented to sick call complaining of weight loss and tremors, both of which he attributed to his thyroid condition. (Doc. 13, ¶ 5; Doc. 14-1, p. 284). An examination was normal. (*Id.*). Thus, Ann Batdorf, CRNP, believed that Boyd's symptoms were the result of anxiety. (*Id.*).

On June 25, 2012, Boyd returned to sick call with the same complaints, as well as new complaints of throat discomfort, a painful tongue, hoarse voice, rapid heart rate, blood in his stool, and pain "all over." (Doc. 13, ¶ 6; Doc. 14-1, p. 284). An examination was again normal. (*Id.*). Nurse Batdorf noted that there was no swelling in Boyd's throat, his tongue was unremarkable, and he exhibited no difficulty swallowing. (*Id.*). Boyd's weight was noted to be unchanged at 136 pounds. (*Id.*). Boyd is 5'1" tall. (Doc. 13, ¶ 6). Nurse Batdorf ordered stool samples to check for blood and issued an order for Boyd's weight to be checked every week for four weeks. (Doc. 13, ¶ 6; Doc. 14-1, pp. 147, 285).

---

genuine issues for trial. *See id.* Unless otherwise noted, the factual background herein derives from the Defendants' Rule 56.1 statements of material facts. (Doc. 13). Boyd did not file a response to Defendants' statement of material facts. The Court accordingly deems the facts set forth by Defendants to be undisputed. *See* LOCAL RULE OF COURT 56.1.

On July 3, 2012, Boyd was again seen at sick call to "check about his thyroid." (Doc. 13, ¶ 7; Doc. 14-1, p. 285). Boyd reported to Defendant Iannuzzi that he was experiencing unexplained weight loss, inability to concentrate, and visual changes. (*Id.*). An examination was normal. (*Id.*). It was noted that the thyroid nodule was not palpable, Boyd reported that he did not have blood in his stool, and his blood pressure was normal at 115/60. (*Id.*). As Boyd had a history of hypertension, Defendant Iannuzzi issued an order for him to have his blood pressure checked daily for one week. (Doc. 13, ¶ 7; Doc. 14-1, p. 146).

On July 23, 2012, Boyd was again seen by Nurse Batdorf "with [the] usual litany of complaints" including body aches, thyroid discomfort, weight loss, headaches, and decreased white blood count which he felt was caused by his psychiatric medication. (Doc. 13, ¶ 8; Doc. 14-1, p. 283). An examination of Boyd's thyroid was unremarkable; there were no masses, nodules, or enlargements, and he gained four pounds since his visit one month earlier. (*Id.*). Nurse Batdord believed that Boyd was anxious and needed reassuring that he was doing well physically. (*Id.*). He was advised that his lab work was stable, he had not lost weight, his blood pressure was controlled, and his thyroid was normal on palpation. (*Id.*).

On September 17, 2012, Boyd was seen by Defendant Iannuzzi at sick call because he did not feel well. (Doc. 13, ¶ 6; Doc. 14-1, p. 279). Although Boyd felt that he was losing weight, Defendant Iannuzzi reassured him that his weight was virtually the same as it had

5

been over the past year. (Id.)

On September 26, 2012, Boyd underwent his first thyroid ultrasound which revealed a single mass measuring 7mm that was believed to be benign. (Doc. 13, ¶ 10; Doc. 14-1, p. 95). On October 22, 2012, Dr. Gaye Gustitus discussed the ultrasound results with Boyd. (Doc. 13, ¶ 10; Doc. 14-1, p. 276). Boyd's weight was 138 pounds. (Id.). Boyd reported that he occasionally experienced tremors, but he reported no other symptoms. (Id.). The plan was to order another ultrasound to confirm whether there was any change to the thyroid nodule. (Doc. 13, ¶ 10; Doc. 14-1, p. 145).

On November 2, 2012, Boyd presented to sick call with a complaint that he felt "like a volcano" was inside him. (Doc. 13, ¶ 11; Doc. 14-1, p. 277). When asked to explain what he meant, Boyd reported that he had tremors, his kidneys hurt, and that his psychiatric medications made him thirsty, caused his heart to race, and caused him to be dizzy on occasion. (Id.). Boyd again reported that he was losing weight; however, when he was weighed, he was found to have gained six pounds. (Id.). Upon examination, no neck masses were noted, however a slight hand tremor was observed. (Id.).

On November 7, 2012, Boyd underwent a thyroid ultrasound, which revealed a stable left lower lobe nodule that appeared to be consistent with adenoma. (Doc. 13, ¶ 12; Doc. 14-1, pp. 91, 94).

On November 23, 2012, Boyd was seen at sick call by Nurse Bartdorf with

6

complaints of tremors, throat discomfort, and weight loss. (Doc. 13, ¶ 13; Doc. 14-1, p.

274). He also reported headaches, which ceased after he stopped taking Remeron. (Id.).

Upon examination, Nurse Batdorf did not observe any tremors. (Id.). She noted that Boyd

had a pea sized nodule at his left thyroid, which was consistent with the recent ultrasound.

(Id.). A review of the chart revealed Boyd's TSH was within normal limits, and he gained a

small amount of weight. (Id.). Nurse Batdorf ordered weekly weight and blood pressure

checks for four weeks, and added Boyd to the thyroid chronic care clinic. (Doc. 13, ¶ 13;

Doc. 14-1, pp. 144, 274).

On February 18, 2013, Boyd was seen by Defendant Iannuzzi to "check up" on his

thyroid condition. (Doc. 13, ¶ 14; Doc. 14-1, p. 275). Boyd reported that he felt that he was

losing weight. (Id.). On examination, Defendant Iannuzzi observed no palpable change to

his thyroid and no significant weight loss. (Id.). Defendant Iannuzzi agreed to recheck

Boyd's thyroid panel and order another thyroid ultrasound. (Id.).

On March 19, 2013, Boyd was seen by Nurse Batdorf secondary to complaints of

throat discomfort, headaches, and tremors. (Doc. 13, ¶ 15; Doc. 14-1, p. 273). During the

examination, Nurse Batdorf observed no throat swelling or tremors, and documented that

Boyd was very animated with a clear, audible voice. (Id.). Nurse Batdorf reassured Boyd

that his thyroid nodule was benign, and that follow-up blood work and an ultrasound were

scheduled. (Id.).

7

On April 2, 2013, Boyd was seen by Dr. Khanum for thyroid chronic care clinic.

(Doc. 13, ¶ 16; Doc. 14-1, p. 271). Although Boyd again complained of weight loss, his

weight was found to be stable at 142 pounds. (*Id*.). A review of the chart showed that the

recent ultrasound revealed a stable thyroid and Boyd's blood work revealed TSH was

stable, revealing only mild hyperthyroidism. (*Id*.). Boyd was started on the hyperthyroid

medication, Propylthiouracil ("PTU"). (Doc. 13, ¶ 16; Doc. 14-1, p. 383).

On May 1, 2013, Boyd was seen by a thyroid specialist, Dr. Narinder Malhotra, *via*

telemedicine. (Doc. 13, ¶ 17; Doc. 14-1, p. 266). On that date, he weighed 145.5 pounds.

(*Id*.). Dr. Malhotra noted that Boyd had a "thyroid nodule on his left side which is palpable,

according to the patient, which has not grown in size over the last six months or so.

However, the patient is complaining of some decreased appetite, shakiness, difficulty with

balance, and weight loss." (Doc. 13, ¶ 17; Doc. 14-1, p. 90). Dr. Malhotra's impression was

that Boyd had a "less than 1cm left lower lobe thyroid nodule, probably benign." (*Id*.). Boyd

reported that his father had thyroid cancer. (*Id*.). Dr. Malhotra wanted to rule out thyroid

cancer, familial cancer, or medullary carcinomas. (*Id*.). He therefore ordered a thyroid scan

and repeat ultrasound of his thyroid. (*Id*.). Dr. Malhotra recommended that PTU be

discontinued based on the small size of the nodule. (Doc. 13, ¶ 17; Doc. 14-1, p. 382).

On May 29, 2013, Boyd underwent a thyroid uptake study. (Doc. 13, ¶ 18; Doc. 14-

1, p. 263). The test revealed decreased uptakes, consistent with hyperthyroidism. (Doc.

8

13, ¶ 18; Doc. 14-1, p. 79).

On June 7, 2013, Boyd presented to sick call complaining of weight loss. (Doc. 13, ¶ 19; Doc. 14-1, pp. 260-261). Boyd weighed 144.4 pounds during this visit. (Id.). Defendant Iannuzzi reassured Boyd that they were awaiting the thyroid uptake results and that he would continue to follow with Dr. Malhotra. (Id.). Defendant Iannuzzi placed Boyd on the hyperthyroid medication, Tapazole at 5mg. (Doc. 13, ¶ 19; Doc. 14-1, p. 382).

On June 18, 2013, Dr. Lisiak treated Boyd. (Doc. 13, ¶ 20; Doc. 14-1, p. 261). An examination revealed no enlarged thyroid nodule. (Id.). Although they were awaiting a repeat ultrasound, Dr. Lisiak explained to Boyd that his two ultrasounds in 2012 revealed a left nodule that was slightly increased in size, and that the recent uptake study revealed low uptake. (Id.). Once the repeat ultrasound was performed, Boyd was assured that he would again be seen by Dr. Malhotra. (Id.).

On June 28, 2013, Dr. Jose Boggio treated Boyd in sick call. (Doc. 13, ¶ 21; Doc. 14-1, p. 258). Boyd reported that his thyroid caused him to lose 40 pounds. (Id.). In reviewing the chart, Dr. Boggio noted that his weight had been stable over the past year at approximately 140 pounds, and assured Boyd that if he had weighed 180 pounds, he would be obese. (Id.). He also advised Boyd that his thyroid nodule was stable according to the studies. (Id.).

On July 2, 2013, Boyd was again seen by Dr. Malhotra. (Doc. 13, ¶ 22; Doc. 14-1,

9

p. 77). During this visit, Dr. Malhotra discussed the recent thyroid study results with Boyd, and advised him that the plan of care was to order another ultrasound and return in six months for follow-up. (*Id.*).

On July 11, 2013, Boyd's weight was 145.6 pounds. (Doc. 13, ¶ 23; Doc. 14-1, p. 255).

On July 17, 2013, Boyd was seen by Defendant Iannuzzi complaining that he felt as though something was crawling under his skin. (Doc. 13, ¶ 24; Doc. 14-1, p. 255). Boyd's weight was stable at 146.6 pounds and his blood pressure was normal at 135/85. (*Id.*). A physical examination was unremarkable. (*Id.*). Also on July 17, 2013, Boyd underwent an ultrasound of his thyroid. (Doc. 13, ¶ 25; Doc. 14-1, p. 74). A stable hypoechoic mass was seen on the left lobe measuring 0.70 x 0.80 x 0.038 cm. (*Id.*).

On July 24, 2013, Defendant Iannuzzi examined Boyd for his regular blood pressure and weight checks. (Doc. 13, ¶ 26; Doc. 14-1, p. 256). Boyd's blood pressure was normal at 122/84 and his weight was 146 pounds. (*Id.*).

On July 31, 2013, Defendant Iannuzzi again treated Boyd. (Doc. 13, ¶ 27; Doc. 14-1, p. 256). Boyd reported that he had not experienced heart palpations since he changed his psychiatric medications. (*Id.*). He also denied tremors, confusion, agitation, or constipation. (*Id.*). Boyd's weight remained stable at 148.8 pounds, and his blood pressure was normal at 130/70. (*Id.*). Defendant Iannuzzi's impression was that Boyd's

10

hyperthyroidism remained mild to sub-clinical. (*Id.*).

On August 14, 2013, Defendant Iannuzzi increased Boyd's dose of Tapazole from 5mg per day to 10mg per day, in response to a decrease of Boyd's TSH levels. (Doc. 13, ¶ 28; Doc. 14-1, p. 382).

On September 4, 2013, Chris Collins, CRNP noted that Boyd had a recent medication change based upon his lab results. (Doc. 13, ¶ 29; Doc. 14-1, p. 254). It was recommended to repeat the TSH levels and return to sick call in one week. (*Id.*).

On September 11, 2013, Defendant Iannuzzi reviewed the recent labs which showed Boyd's TSH to be 0.073 (range of 0.465-4.68), indicating mild hypothyroidism. (Doc. 13, ¶ 30; Doc. 14-1, p. 252). As a result, Defendant Iannuzzi made the decision to increase Boyd's Tapazole dose, and to repeat the lab work. (*Id.*).

Ob September 24, 2013, Dr. Khanum treated Boyd for his thyroid. (Doc. 13, ¶ 31; Doc. 14-1, p. 250). Dr. Khanum noted that while Boyd denied chest pain or shortness of breath, he said "yes to almost every other symptom when asked." (*Id.*). Accordingly, she questioned whether Boyd was making up his symptoms. (*Id.*). Dr. Khanum reviewed Boyd's labs, and found his TSH levels to be clinically stable. (*Id.*). Because Boyd was noncompliant with his medications, Dr. Khanum changed the prescription for Tapazole from KOP (keep on person) to DOT (direct observation therapy). (*Id.*). She also ordered repeat lab work in 6 weeks, noted that a repeat ultrasound was scheduled for February 2014, and

ordered follow-up in chronic care clinic in 6-7 weeks. (*Id*.).

On October 20, 2013, the medical department received a call from security after Boyd demanded to be seen on the block to discuss his thyroid condition. (Doc. 13, ¶ 32; Doc. 14-1, pp. 248-249). Boyd told Nurse Bushniski, "I want you to take my vital signs, my blood pressure and pulse and write it down. You need to get them to do something about my thyroid. The medication isn't helping." (Doc. 13, ¶ 32; Doc. 14-1, p. 248).

Boyd was thereafter seen by Dr. Khanum. Boyd again complained that he was not receiving appropriate treatment for his hyperthyroidism and demanded to be seen by a "specialist." (Doc. 13, ¶ 33; Doc. 14-1, pp. 248-249). An examination was unremarkable. (*Id*.). His pulse was normal at 58 and blood pressure was normal at 108/68. (*Id*.). Dr. Khanum counseled Boyd regarding protocol treatment for hyperthyroidism, and provided him with reassurance that his thyroid was stable and did not require intervention at that time. (*Id*.). As his thyroid was stable, Dr. Khanum issued an order to decrease his dosage of Tapazole from 10mg to 5mg per day. (Doc. 13, ¶ 33; Doc. 14-1, p. 381).

On October 3, 2013, Boyd was seen by nursing with complaints of "breathing funny," sweating, vomiting, and pins and needles in his arms. (Doc. 13, ¶ 34; Doc. 14-1, p. 251). He reported that he was worried about his thyroid levels. (*Id*.). An examination was unremarkable. (*Id*.). Boyd exhibited no shortness of breath, he was speaking clearly, and his vital signs were normal. (*Id*.). He was given Tums and Tylenol. (*Id*.). Boyd was

12

advised to return to sick call the following morning, however he failed to do so. (Id.).

On November 5, 2013, Boyd advised Dr. Lisiak that he felt worse after starting the thyroid medication Tapazole, and that he suffered from sweating, palpations, and muscle spasms. (Doc. 13, ¶ 35; Doc. 14-1, p. 246). On examination, no obvious muscle twitching was observed and no thyroid nodules were palpable. (Id.). Dr. Lisiak reviewed Boyd's labs and confirmed that his TSH was stable. (Id.). The plan was to repeat the labs the following week, and continue Tapazole. (Id.).

Two weeks later, Boyd returned to Dr. Lisiak secondary to complaints of muscle spasms of his neck. (Doc. 13, ¶ 36; Doc. 14-1, p. 247). On examination, Dr. Lisiak did not observe any spasms on palpation, and found no palpable nodules during the neck examination. (Id.). He explained to Boyd that his last TSH had improved to 0.677 (range of 0.465-4.68), indicating normal thyroid function, and his weight increased to 152 pounds. (Id.). As he appeared to be stable, Dr. Lisiak recommended that Boyd continue taking Tapazole. (Id.).

On November 27, 2013, Boyd again presented to the medical department complaining that his thyroid was not being properly treated. (Doc. 13, ¶ 37; Doc. 14-1, p. 247). No nodules were palpated around the larynx. (Id.). However, the thyroid was enlarged. (Id.). Although his heart and lungs were normal on examination, because Boyd complained of palpations, he was sent to triage for further assessment. (Id.).

13

On December 18, 2013, Boyd underwent another ultrasound of his thyroid, which revealed a hypoechoic mass in the left lobe most consistent with adenoma. (Doc. 13, ¶ 38; Doc. 14-1, pp. 72, 93). When compared to the previous ultrasound, it was noted to be unchanged or minimally changed. (Id.).

On December 29, 2013, Boyd asked whether his prescription for Tapazole could be changed to KOP (keep on person). (Doc. 13, ¶ 39; Doc. 14-1, p. 244). At the time, Boyd was described as talkative and euphoric, and did not appear to be in any apparent distress. (Id.). Nurse Collins changed Tapazole to KOP. (Id.).

On January 3, 2014, Boyd again voiced his concerns about his thyroid treatment to Nurse Collins and advised him that a "'court order' [was] pending concerning his hyperthyroid medications and thyroid medical care." (Doc. 13, ¶ 40; Doc. 14-1, p. 245). Nurse Collins agreed to discontinue Tapazole to see whether his symptoms resolved. (Doc. 13, ¶ 40; Doc. 14-1, pp. 245, 379).

On January 10, 2014, Dr. Malhotra treated Boyd. (Doc. 13, ¶ 41; Doc. 14-1, p. 242). After reviewing the ultrasound results, Dr. Malhotra opined that there was no significant interval change in the left thyroid nodule. (Id.). Between September 26, 2012 and December 19, 2013, Boyd underwent multiple ultrasounds, which revealed a minor increase in size of the nodule from 0.6cm to 0.8cm. (Id.). Upon physical examination, no nodules were palpable. (Id.). Dr. Malhotra wrote: "As per NCCN guidelines, as he still has a less

14

than 1cm nodule, we will monitor him. We will reschedule ultrasound of the thyroid in November of this year, and follow-up after ultrasound. If it has increased in size over a cm, we will consider a needle biopsy." (*Id.*). As of the date of this visit, Boyd was not taking any medications for his hyperthyroidism, and Dr. Malhotra did not recommend any medications. (*Id.*).

On January 27, 2014, Dr. Khanum treated Boyd for complaints of weight loss, dizziness, and shakiness. (Doc. 13, ¶ 42; Doc. 14-1, p. 243). Although the records indicate that Boyd was not taking any thyroid medications as of this time, Boyd stated his "meds [were] not working, I take them regularly. I need better meds out there on the market." (*Id.*). Dr. Khanum examined Boyd and found his weight was stable at 152.6 pounds, his blood pressure and heart rate were normal, and no tremors were observed. (*Id.*). She reviewed his chart and found that his thyroid condition continued to be stable pursuant to the labs. (*Id.*). Dr. Khanum ordered repeat labs and scheduled a follow-up in the chronic care clinic. (*Id.*).

On February 3, 2014, labs were collected and revealed an elevated TSH of 4.97 (range of 0.465-4.68), indicating mild hypothyroidism. (Doc. 13, ¶ 43; Doc. 14-1, p. 46). Prior to this date, Boyd's TSH levels revealed mild hyperthyroidism. (Doc. 13, ¶ 43). This was the first occasion that his TSH levels increased to reveal hypothyroidism. (*Id.*).

On March 25, 2014, Boyd was seen in chronic care clinic for his thyroid condition.

15

(Doc. 13, ¶ 44; Doc. 14-1, p. 238). Boyd's weight was 147 pounds, and his blood pressure was slightly elevated at 144/84. (*Id.*). Dr. Khanum ordered Boyd to have his blood pressure checked three times per week for two weeks. (*Id.*). Dr. Khanum noted that Boyd's hyperthyroidism medication had been discontinued, and he instructed Defendant Iannuzzi to re-order the hyperthyroidism medication. (Doc. 13, ¶ 44; Doc. 14-1, p. 378).

On April 7, 2014, labs were repeated and revealed a markedly elevated TSH of 59.13 (range of 0.465-4.68), indicating hypothyroidism. (Doc. 13, ¶ 45; Doc. 14-1, p. 44).

On April 11, 2014, Defendant Iannuzzi called Boyd to the medical department to evaluate Boyd in light of his recent abnormal blood work. (Doc. 13, ¶ 46; Doc. 14-1, p. 237). Boyd had no complaints other than an occasional loose stool. (*Id.*). He denied fatigue, weight gain, visual changes, or any other unusual symptoms. (*Id.*). Defendant Iannuzzi therefore suspected that the lab was an error, and ordered a repeat lab to confirm his TSH. (*Id.*).

On April 18, 20140, labs were collected and again revealed an elevated TSH of 64.81 (range of 0.465-4.68), indicating hypothyroidism. (Doc. 13, ¶ 47; Doc. 14-1, p. 43). On April 21, 2014, Nurse Collins reviewed Boyd's labs. (*Id.*). The following day, Defendant Iannuzzi discussed the lab results with Boyd. (Doc. 13, ¶ 48; Doc. 14-1, p. pp. 235-236). Boyd had no complaints and his vitals were normal. (*Id.*).

On May 2, 2014, Boyd was seen in sick call by Dr. Lisiak secondary to generalized

16

pain in his abdomen and vomiting. (Doc. 13, ¶ 49; Doc. 14-1, p. 234). The plan was to give Boyd Pepto-Bismol and to observe him in the infirmary. (Id.). Later that afternoon, Dr. Lisiak noted that Boyd was not answering questions appropriately, refused to have his blood pressure and temperature taken, his speech was garbled, he did not make eye contact, and he refused to follow commands. (Doc. 13, ¶ 50 ; Doc. 14-1, p. 234). Dr. Lisiak therefore ordered that Boyd be transferred to the Schuylkill Medical Center emergency room for further treatment. (Id.).

Upon his arrival to Schuylkill Medical Center, it was noted that Boyd had his eyes closed, he was engaged in confused rambling conversation, and was uncooperative with staff. (Doc. 13, ¶ 51; Doc. 14-1, p. 322). Several tests were performed, including a chest X-ray, CT and MRI of the head, and a thyroid ultrasound. (Doc. 13, ¶ 51; Doc. 14-1, pp. 321-329). The thyroid ultrasound revealed an enlarged thyroid gland with no discrete thyroid nodules demonstrated. (Doc. 13, ¶ 51; Doc. 14-1, p. 329). At the time of admission to the hospital, the physician's impression was as follows:

Altered mental status of unclear etiology. The patient may have access to some illicit drugs such as bath salts but at this time there is no way to confirm that. There is no evidence of infection to cause his symptoms. It does not seem an acute psychotic episode as the patient currently does not have any evidence of hallucinations, delusions, or other evidence of thought process except the confusion and rambling speech and incoherence. No evidence of other metabolic abnormalities detected at this time.

(Doc. 13, ¶ 50; Doc. 14-1, pp. 332-333).

17

On May 6, 2014, while at the Schuylkill Medical Center, Dr. Nicole Purcell treated Boyd. (Doc. 13, ¶ 52; Doc. 14-1, pp. 339-344). Dr. Purcell did not indicate that she believed that Boyd had an allergic reaction to his thyroid medication. (Doc. 13, ¶ 52; Doc. 14-1, p. 343). Rather, she opined that Boyd's episode "could possibly be related to a seizure." (Id.).

At the time of Boyd's discharge from Schuylkill Medical Center, he was diagnosed with altered mental status, schizoaffective disorder, hypertension, anxiety, depressive disorder, c-diff, and hypothyroidism. (Doc. 13, ¶ 53; Doc. 14-1, p. 345). There is no indication that the hospital believed Boyd suffered from an allergic reaction to his hypertension medication. (Id.). At discharge from the hospital, Tapazole was not listed as an allergy. (Doc. 13, ¶ 53; Doc. 14-1, p. 363).

Boyd's medication was changed to Levothroid. (Doc. 13, ¶ 54; Doc. 14-1, p. 346). The medication was not changed due to a concern of allergy. (Id.). The change was made because Boyd had an episode of hypothyroidism, and Levothroid is used to treat hypothyroidism. (Doc. 13, ¶ 54; Doc. 14-1, p. 360). Tapazole is used to treat hyperthyroidism. (Doc. 13, ¶ 54).

Upon his return to the prison, Boyd was admitted to the infirmary for observation. (Doc. 13, ¶ 55; Doc. 14-1, p. 299).

On May 7, 2014, Dr. Lisiak treated Boyd in the infirmary. (Doc. 13, ¶ 56; Doc. 14-1,

18

pp. 299-300). Dr. Lisiak noted that the hospital found increased potassium and ammonia levels, but no clear etiology for his change in mental status. (Doc. 13, ¶ 56; Doc. 14-1, p. 299). He further noted that Boyd has had TSH less than 1 (hyperthyroid) and was stable when treated with Tapazole. (Doc. 13, ¶ 56; Doc. 14-1, p. 300). However, because his TSH increased to 60 (indicating hyperthyroidism), Tapazole was discontinued and instead, Boyd was placed on Levothroid. (Id.). Following an examination, Dr. Lisiak issued an order for Boyd's TSH levels to be re-checked in two weeks and for Boyd to continue taking Levothroid. (Doc. 13, ¶ 56; Doc. 14-1, pp. 295, 300, 376). Boyd was discharged from the infirmary that day. (Doc. 13, ¶ 56; Doc. 14-1, p. 129).

On May 23, 2014, labs were collected and revealed a normal TSH of 1.13 (range of .465-4.68), indicating normal thyroid function. (Doc. 13, ¶ 57; Doc. 14-1, p. 40).

On May 28, 2014, Boyd was seen in sick call secondary to concerns that he was losing weight. (Doc. 13, ¶ 58; Doc. 14-1, p. 227). Boyd's weight at that time was stable at 147.6 pounds. (Id.).

On June 9, 2014, labs were taken and revealed stable TSH of 0.097 (range of .465-4.68), indicating mild hyperthyroidism. (Doc. 13, ¶ 59; Doc. 14-1, p. 39).

On June 14, 2104, Boyd was seen by Dr. Pandya, and complained that he was shaking and losing weight, even though he was hungry all the time. (Doc. 13, ¶ 60; Doc. 14-1, p. 223). His weight at that time was stable at 141 pounds. (Id.).

On July 5, 2014, Boyd was seen by Dr. Lisiak for his continued complaints of abdominal pain. (Doc. 13, ¶ 61; Doc. 14-1, pp. 222, 225). Dr. Lisiak noted: "We had been treating his thyroid [with] Tapazole. Multiple thyroid studies were very low (hyperthyroidism) yet patient remained convinced that 'something is going on with my thyroid.' He was started on Synthroid [Levothroid] while at an outside hospital (the only time his TSH was elevated). Since then his TSH has [decreased] to 1.13 and then 0.097. He is very likely hyperthyroid. I will repeat TSH and will decrease Synthroid to 25mcg." (Doc. 13, ¶ 61; Doc. 14-1, p. 222).

On July 10, 2014, labs were collected and revealed stable TSH of 0.102 (range of .465-4.68), indicating mild hyperthyroidism. (Doc. 13, ¶ 62; Doc. 14-1, p. 38).

As Boyd's TSH levels had stabilized, Dr. Lisiak discontinued Levothroid on August 4, 2013. (Doc. 13, ¶ 63; Doc. 14-1, p. 375).

On September 8, 2014, Dr. Rashida Lawrence treated Boyd in sick call. (Doc. 13, ¶ 64; Doc. 14-1, p. 221). Boyd reported that he lost 65 pounds over "months" and that he experienced heart pounding, muscle aches, tremors, light sensitivity, heart racing, and stiffness, which he attributed to his thyroid condition. (*Id.*). An examination was normal. (*Id.*). Upon review of Boyd's labs, Dr. Lawrence confirmed that his thyroid function and hormone levels were normal and his ultrasounds were within normal limits. (*Id.*). Palpation of his neck revealed no obvious enlargement, no palpable nodules, and no tenderness or redness. (*Id.*). Dr. Lawrence "explained he currently has normal thyroid function. His

20

symptoms are general and are likely not due to his thyroid at this time." (*Id*.).

On September 17, 2014, Boyd was seen in chronic care clinic for his thyroid condition. (Doc. 13, ¶ 65; Doc. 14-1, p. 217). Dr. Lisiak noted that Boyd was not taking thyroid medication at that time and his T4 and total T3 (hormones that indicate thyroid functioning) were within normal limits. (*Id*.). Dr. Lisiak also noted that Boyd's weight remained stable, and that his hypertension remained stable on three blood pressure medications. (*Id*.).

On September 23, 2014, Boyd was transferred from SCI-Frackville to SCI-Mahanoy. (Doc. 13, ¶ 66; Doc. 14-1, p. 216).

On October 1, 2014, labs were collected and revealed stable TSH of 0.197 (range of 0.465-4.68), indicating mild hyperthyroidism. (Doc. 13, ¶ 67; Doc. 14-1, p. 34).

On October 6, 2014, Boyd was seen by Defendant Iannuzzi, and questioned why he was no longer receiving thyroid medication. (Doc. 13, ¶ 68; Doc. 14-1, p. 215). In reviewing the chart, Defendant Iannuzzi noted that his TSH was stable, but still indicated mild hyperthyroidism. (*Id*.). Defendant Iannuzzi began Boyd on Tapazole and advised the nursing staff that he was to receive this medication as DOT (direct observation) to maximize compliance. (Doc. 13, ¶ 68; Doc. 14-1, pp. 120-21, 374).

On October 15, 2014, Boyd returned to sick call with complaints of agitation, weight loss, sweating, occasional palpations, and occasional loose stools. (Doc. 13, ¶ 69; Doc. 14-

21

1, p. 215). Boyd's weight was 147 pounds, a six pound weight gain. (Id.). Boyd's blood pressure was slightly elevated at 140/80, however the rest of the examination was unremarkable. (Id.). During this visit, Defendant Iannuzzi explained to Boyd that he had hyperthyroidism, and that while he briefly experienced hypothyroidism in January, he was now progression back toward hyperthyroidism. (Doc. 13, ¶ 69; Doc. 14-1, p. 212). Defendant Iannuzzi advised Boyd that his Tapazole would continue to be provided DOT. (Id.).

On October 27, 2014, Boyd had no complaints when seen at sick call. (Doc. 13, ¶ 70; Doc. 14-1, p. 213). His weight was stable at 145 pounds, and an examination was unremarkable. (Id.).

On November 18, 2014, labs were taken and revealed a stable TSH of 0.006 (range of .465-4.68), indicating hyperthyroidism. (Doc. 13, ¶ 71; Doc. 14-1, p. 32). The following day, Boyd underwent a thyroid ultrasound, which revealed a normal-sized thyroid. (Doc. 13, ¶ 72; Doc. 14-1, p. 91).

On December 3, 2014, Dr. Panyda saw Boyd to review his recent labs and ultrasound, which were unchanged from the previous testing and studies. (Doc. 13, ¶ 73; Doc. 14-1, p. 211). When Dr. Pandya questioned Boyd about his noncompliance with Tapazole, Boyd explained that he felt Tapazole had sent him to the hospital. (Id.). Boyd's weight was stable at 145.3 pounds, and his vitals were normal. (Id.). The plan was to

22

continue to offer Tapazole. (*Id.*).

Also that day, Boyd was seen in consultation by thyroid specialist Dr. Malhotra. (Doc. 13, ¶ 74; Doc. 14-1, p. 64). Dr. Malhotra noted: "The patient states that Tapazole was making him sick. He was having some palpitations and weight loss. He has been taken off the medications 10 days ago." (*Id.*). In reviewing the recent studies, Dr. Malhotra noted that the sonogram of Boyd's thyroid performed on November 19, 2014 revealed a nodule measuring 7mm, which was the same size it had been in 2012. (*Id.*). He also noted that thyroid functions performed in October were essentially normal. (*Id.*). In the plan, Dr. Malhotra explained that since the nodule was less than 1 cm, per NCCN guidelines, it should be monitored. (*Id.*). It could not be biopsied because it was too small. (*Id.*).

On January 2, 2015, Dr. Pandya treated Boyd. (Doc. 13, ¶ 75; Doc. 14-1, p. 207). Boyd advised Dr. Pandya that "the guy on telemed told me to stop the medication." (*Id.*). Dr. Pandya opined that Boyd was now at a sub-clinical stage with regard to his hyperthyroidism. (*Id.*). Boyd was offered Tapazole, however he declined and insisted on receiving Levothroid, a medication for hypothyroidism, not hyperthyroidism. (*Id.*). As Boyd was non-compliant with Tapazole, this medication was discontinued. (Doc. 13, ¶ 75; Doc. 14-1, p. 373).

On January 28, 2015, labs were collected and revealed a stable TSH of 0.031 (range of 0.465-4.68), indicating mild hyperthyroidism. (Doc. 13, ¶ 76; Doc. 14-1, p. 31).

23

On February 4, 2015, Boyd reported to sick call with complaints of discomfort in his throat, difficulty swallowing, and muscle spasms. (Doc. 13, ¶ 77; Doc. 14-1, p. 204). Boyd explained that these symptoms became worse after he began taking a new psychiatric medication, Zoloft. (*Id.*). Upon examination, Dr. Pandya observed no change in Boyd's thyroid. (*Id.*). He also noted that Boyd's most recent labs showed that his thyroid enzymes were stable, and reassured Boyd that his thyroid condition was unchanged. (*Id.*). The plan was to consult with psychiatry to discontinue Zoloft. (*Id.*).

On February 18, 2015, labs were collected and revealed a stable TSH of 0.038 (range of 0.465-4.68), indicating mild hyperthyroidism. (Doc. 13, ¶ 78; Doc. 14-1, p. 28).

On March 11, 2015, Boyd was seen in chronic care clinic for his thyroid condition. (Doc. 13, ¶ 79; Doc. 14-1, p. 203). An examination revealed no palpable nodule on Boyd's neck, and the thyroid was found to be normal in size. (*Id.*). Dr. Pandya noted that Boyd continued to refuse Tapazole. (*Id.*). Due to his occasionally high blood pressure, the plan was to add Prinzide and to discontinue Chlorthalidone, both blood pressure medications, and to check his blood pressure for four weeks. (*Id.*).

On April 6, 2015, Defendant Iannuzzi evaluated Boyd secondary to his complaints of headaches, jitteriness, and shakiness. (Doc. 13, ¶ 80; Doc. 14-1, p. 201). However, Boyd acknowledged that he did not suffer from any of these symptoms at the time of the visit. (*Id.*). An examination was unremarkable. (*Id.*). Boyd weighed 138 pounds and no palpable

24

nodules were observed. (*Id.*). Defendant Iannuzzi explained to Boyd that the thyroid nodule was stable in size, and remained unchanged in size in the three years since Boyd was first diagnosed with hyperthyroidism. (*Id.*). Boyd remained non-compliant with his hyperthyroidism medication. (*Id.*). Defendant Iannuzzi thus provided education to Boyd regarding the importance of medication compliance. (*Id.*).

On May 19, 2015, labs were taken and revealed a stable TSH of 0.029 (range of 0.465-4.68), indicating mild hyperthyroidism. (Doc. 13, ¶ 81; Doc. 14-1, p. 27).

On June 29, 2015, Boyd was seen at his cell by nursing secondary to numbness in his right arm. (Doc. 13, ¶ 82; Doc. 14-1, pp. 199-200). It was noted that he was "utilizing right arm easily throughout conversation." (Doc. 13, ¶ 82; Doc. 14-1, p. 199). Boyd again reported that he was not taking his thyroid medication. (*Id.*). Boyd denied headaches, dizziness, light headedness, syncope, or visual disturbance. (*Id.*).

The following morning, Defendant Iannuzzi treated Boyd. (Doc. 13, ¶ 83; Doc. 14-1, pp. 197-98). Although Boyd reported that he was unable to move his hand, Defendant Iannuzzi noted that after talking with him for a while, Boyd began to take photographs of his family in and out of his wallet, folded his shirt, and used his hand adeptly. (Doc. 13, ¶ 83; Doc. 14-1, p. 197). An examination of Boyd's hand was normal. (*Id.*). His blood pressure was elevated and Defendant Iannuzzi therefore increased Boyd's blood pressure medication to two times per day. (Doc. 13, ¶ 83; Doc. 14-1,pp. 197-98).

25

On June 2, 2015, Boyd presented to sick call with complaints of throat discomfort, blood in his spit, and blood in his stool. (Doc. 13, ¶ 84; Doc. 14-1, p. 198). His weight was 135 pounds. (*Id.*). An examination revealed no blood in Boyd's mouth and no change in the size of his thyroid nodule. (*Id.*). Defendant Iannuzzi advised Boyd that there was no growth in his thyroid nodule for more than two years, and that he experienced no significant weight loss. (*Id.*). Boyd nevertheless demanded a new thyroid medication so that he could gain weight . (*Id.*). As there was no clinical indication for thyroid medication, Defendant Iannuzzi denied this request. (*Id.*).

On July 2, 2015, Dr. Malhotra treated Boyd. (Doc. 13, ¶ 85; Doc. 14-1, p. 63). Dr. Malhotra noted that Boyd had been off of Tapazole for more than six months, and he was "[s]till having multiple complaints including tremors, weight loss, and difficulty swallowing, all which he attributes to the thyroid nodules." (*Id.*). Boyd complained of weight loss; however, there was no significant weight loss described in the chart. (*Id.*). Dr. Malhotra's impression was that the thyroid nodule was stable and, therefore, the plan was to continue to monitor Boyd. (*Id.*).

On September 2, 2015, Boyd was seen in chronic care clinic by Dr. Pandya. (Doc. 13, ¶ 86; Doc. 14-1, p. 195). His weight was stable at 132 pounds and his blood pressure were stable at 128/78. (*Id.*). Boyd agreed to try Tapazole once again. (*Id.*). Accordingly, this medication was re-ordered. (Doc. 13, ¶ 86; Doc. 14-1, p. 372).

26

On September 17, 2015, Boyd requested to see his medical records from the Schuylkill Medical Center. (Doc. 13, ¶ 87; Doc. 14-1, p. 193). Copies were given to Boyd the same day. (Id.).

On October 22, 2015, labs were taken and revealed a stable TSH of 0.103 (range of 0.465-4.68), indicating mild hyperthyroidism. (Doc. 13, ¶ 88; Doc. 14-1, p. 23). Defendant Iannuzzi noted that Boyd was only 57.1% compliant with Tapazole. (Id.).

On November 8, 2015, Boyd was seen at this cell door secondary to "multiple medical complaints." (Doc. 13, ¶ 89; Doc. 14-1, p. 194). He reported that his symptoms were related to Tapazole. (Id.). However, in reviewing the medication administration record, the nurse noted that Boyd was non-complaint with this medication. (Id.). The nurse further noted that Boyd was "fixated on medication he refuses to take." (Id.).

The following day, Defendant Iannuzzi treated Boyd. (Doc. 13, ¶ 90; Doc. 14-1, pp. 191-92). Boyd reported that he did not feel Tapazole was working, and he felt it made him hyper and was causing him to lose weight. (Doc. 13, ¶ 90; Doc. 14-1, p. 191). Boyd's weight was 140 pounds, 5 pounds more than what he weighed two months earlier. (Id.). No nodule was palpable upon examination. (Id.). In reviewing the medication administration record, Defendant Iannuzzi noted that Boyd was non-complaint with Tapazole, with a compliance of only 42.7%. (Id.). He again educated Boyd regarding his condition. (Doc. 13, ¶ 90; Doc. 14-1, p. 192). Defendant Iannuzzi informed Boyd that his thyroid and weight

were stable, and advised him of the importance of medication compliance. (*Id.*).

On November 19, 2015, Boyd underwent an ultrasound of his thyroid which revealed a 10 x 6mm nodule in the left lobe which had increased in size from the prior study. (Doc. 13, ¶ 91; Doc. 14-1, p. 59).

On December 1, 2015, Boyd reported to a nurse that he refused to take Tapazole because "it doesn't work." (Doc. 13, ¶ 92; Doc. 14-1, p. 188). Although he reported muscle spasms all over his body, he was observed walking to the medical department briskly and without difficulty. (*Id.*).

Once at the medical department, Defendant Iannuzzi evaluated Boyd. (Doc. 13, ¶ 93; Doc. 14-1, pp. 186-87). Boyd reported that he was "losing weight constantly." (Doc. 13, ¶ 93; Doc. 14-1, p. 186). He also reported getting cramps all over his body, but denied experiencing any cramps during this visit. (*Id.*). Boyd was convinced that his symptoms were the result of his hyperthyroid medication. (*Id.*). When Defendant Iannuzzi explained to Boyd that there were essentially only two medications to treat hyperthyroidism (one of which was Tapazole, which he had refused to take), Boyd became argumentative and stated, "that's not true, I have a list of dozens of meds in my cell." (*Id.*). When Defendant Iannuzzi asked Boyd to name one, he responded, Synthroid, also known as Levothriod. (*Id.*). Defendant Iannuzzi explained to Boyd that Synthroid was prescribed for hypothyroidism, and that he suffered from hyperthyroidism and, therefore, Synthroid was

28

inappropriate. (*Id.*). Boyd's weight was stable at 140.5 pounds. (*Id.*). Defendant Iannuzzi wrote: "Mild mod[erate] hyperthyroidism [with] stable <7mm nodule. Followed by oncology and with care plan followed that was created by oncology and in accordance [with] NCCN guidelines." (Doc. 13, ¶ 93; Doc. 14-1, p. 187). Due to Boyd's non-compliance and agitation, Defendant Iannuzzi ordered a consult with psychiatry, and ordered a medical lay-in so that Boyd could digest the information provided to him. (*Id.*).

On December 2, 2015, Boyd underwent an ultrasound which revealed a slight increase in the nodule size. (Doc. 13, ¶ 94; Doc. 14-1, p. 187). A consult with an oncologist was ordered. (Doc. 13, ¶ 94; Doc. 14-1, pp. 109, 187).

On December 8, 2015, Boyd complained of loose stools two to three times per week. (Doc. 13, ¶ 95; Doc. 14-1, p. 187). He was seen in sick call by Defendant Iannuzzi, and denied all other complaints. (*Id.*). Boyd stated that he was "losing a lot of weight", however his weight increased to 145.5 pounds. (*Id.*). Boyd again told Defendant Iannuzzi that "there are dozens of medications I could be getting. My family sent me a list. I'm not getting any." (Doc. 13, ¶ 95; Doc. 14-1, p. 184). Boyd refused to take PTU, the only medication other than Tapazole that treats hyperthyroidism, because he felt it was worse than Tapazole. (*Id.*). He also refused to take Tapazole. (*Id.*). Defendant Iannuzzi explained to Boyd that loose stools are a consequence of non-compliance with his medications. (*Id.*). Defendant Iannuzzi also advised Boyd that his weight was stable, even when going back three years.

29

(Id.). To reassure him, Defendant Iannuzzi agreed to have the small, stable thyroid nodule biopsied. (Id.). He submitted a consultation request for the same that day. (Doc. 13, ¶ 95; Doc. 14-1, p. 56). In the consult note, Defendant Iannuzzi indicated that Boyd was non-compliant on Tapazole, and refused to take PTU. (Id.).

One hour later, Defendant Iannuzzi received a call from the unit manager after Boyd was adamant to speak with his family because he claimed he had cancer and was dying. (Doc. 13, ¶ 96; Doc. 14-1, p. 185). (Id.). Defendant Iannuzzi met with Boyd and explained to him that the nodule was stable and that there was a very low probability of cancer. (Id.). Defendant Iannuzzi offered Boyd the opportunity to return to sick call on a later date, without being charged a co-pay, and Iannuzzi would again explain his medical history and diagnosis. (Id.). Boyd did not take Defendant Iannuzzi up on this offer. (Id.).

On January 19, 2016, Boyd was seen by the medical department after complaining of chest pain. (Doc. 13, ¶ 97; Doc. 14-1, pp. 179-180). Boyd's blood pressure was elevated at 150/100, and an ambulance was called. (Id.). Boyd became increasingly short of breath right before the ambulance arrived, and as a result, he was given nitroglycerin. (Id.).

Boyd was then taken to the Schuylkill Medical Center East. (Doc. 13, ¶ 98; Doc. 14-1, pp. 177, 302). It was determined that Boyd's cardiac enzyme was mildly elevated and he was transferred to Geisinger Medical Center for a full cardiac work-up. (Doc. 13, ¶ 98; Doc.

30

14-1, p. 302). At Geisinger, an EKG was performed and no ischemia was detected. (Id.). Boyd's blood work revealed that his cardiac enzyme levels were no longer elevated. (Id.). In order to rule out obstructive coronary artery disease, a cardiac catheterization was ordered and found to be unremarkable. (Id.). Geisinger Medical Center called the prison later that day and reported that Boyd was stable and pain free, and that the cardiac tests were negative. (Doc. 13, ¶ 98; Doc. 14-1, p. 178). During this hospital visit, Boyd self-reported that he was allergic to Tapazole, even though no medical provider ever diagnosed any allergy. (Doc. 13, ¶ 99; Doc. 14-1, p. 301). Based upon this self-reporting, and without testing Boyd for any allergy, the hospital instructed Boyd to stop taking this medication. (Doc. 13, ¶ 99; Doc. 14-1, p. 319).

Boyd was discharged from Geisinger Medical Center the following day with a diagnosis of "chest pain – non-cardiac." (Doc. 13, ¶ 100; Doc. 14-1, p. 303). The records do not indicate that Boyd's non-cardiac chest pain was the result of his hyperthyroidism or any medications. (Id.). The records do not suggest that Boyd suffered from a thyroid storm. (Id.).

Upon his return to the prison, Boyd was placed in the infirmary for two days for observation. (Doc. 13, ¶ 101; Doc. 14-1, pp. 175, 178). During this time, no complaints were noted. (Doc. 13, ¶ 101; Doc. 14-1, p. 175).

On January 21, 2016, Dr. David Robel treated Boyd. (Doc. 13, ¶ 102; Doc. 14-1, p.

31

174). In his progress note, Dr. Robel noted that "per Geisinger, they want Tapazole stopped b/c of 'an allergy to it.'" (*Id.*). A review of the chart, however, revealed that Boyd has essentially not taken this medication, with only 4.9% compliance since November, 2015. (*Id.*). He states that he was told that they would give him "something else." (*Id.*). Given the alleged allergy, Dr. Robel advised Boyd that he would be seen in sick call after his thyroid was rechecked to discuss beginning PTU, assuming a medication was needed at all. (*Id.*). Tapazole was discontinued that day. (Doc. 13, ¶ 102; Doc. 14-1, p. 370).

On February 4, 2016, labs were collected and revealed a stable TSH of 0.577 (range of 0.465-4.68), indicating normal thyroid function. (Doc. 13, ¶ 103; Doc. 14-1, p. 20). On the test results, Dr. Pandya wrote that Boyd was currently non-complaint with his medication, and refused to take the same. (*Id.*). They were waiting for a biopsy of the thyroid nodule. (*Id.*).

On February 5, 2016, Boyd underwent a biopsy to his thyroid. (Doc. 13, ¶ 104; Doc. 14-1, pp. 54-55, 57).

On March 3, 2016, Dr. Malhotra treated Boyd. (Doc. 13, ¶ 105; Doc. 14-1, pp. 49-50). Dr. Malhotra indicated that the biopsy that was undertaken the previous month was non-diagnostic for cancer. (Doc. 13, ¶ 105; Doc. 14-1, p. 49). Based upon these findings, Dr. Malhotra recommended only that Boyd continue to be monitored and follow-up in six months. (Doc. 13, ¶ 105; Doc. 14-1, p. 50).

32

On March 9, 2016, Boyd was seen in chronic care clinic for his thyroid condition. (Doc. 13, ¶ 106; Doc. 14-1, p. 165). His weight was 142 pounds. (Id.). Boyd again refused to take PTU or Tapazole, but told Dr. Pandya that he would get the name of the pill that "works on my thyroid." (Id.).

On March 17, 2016, Defendant Iannuzzi treated Boyd in sick call. (Doc. 13, ¶ 107; Doc. 14-1, pp. 163-164). Defendant Iannuzzi noted that Boyd was "still refusing PTU, Tapazole, or any treatment." (Doc. 13, ¶ 107; Doc. 14-1, p. 163). During this visit, Boyd reported a heartburn-like pain that he was unable to describe. (Id.). Boyd also reported that he was losing weight and that he wanted to weigh 200 pounds like he was over 10 years earlier. (Id.). Although Boyd complained of a hand tremor, he did not experience any tremors that day. (Id.). At that time, Boyd's weight was 145 pounds, which was a 10lb increase since four years earlier. (Doc. 13, ¶ 107; Doc. 14-1, p. 164). An examination was unremarkable. (Id.). IDefendant Iannuzzi's opined that Boyd had mild hyperthyroidism by clinical picture. (Id.). He ordered Boyd to return to the medical department in 5-7 days for reevaluation. (Doc. 13, ¶ 107; Doc. 14-1, p. 105).

On March 24, 2016, Boyd reported to Defendant Iannuzzi that he was feeling better and less jittery on his new hypertension medication. (Doc. 13, ¶ 108; Doc. 14-1, p. 161). Boyd had no other complaints. (Id.). An order was placed for Boyd to follow-up in 5-7 days to have his blood pressure checked. (Doc. 13, ¶ 108; Doc. 14-1, p. 105).

33

On April 20, 2016, labs were collected and revealed a stable TSH of 0.043, indicating mild hyperthyroidism. (Doc. 13, ¶ 109; Doc. 14-1, p. 18).

On May 8, 2016, Boyd was seen in his cell by Nancy Palmigiano, PA-C. (Doc. 13, ¶ 110; Doc. 14-1, pp. 159-160). At that time, he refused to take Tapazole, claiming that he was allergic to it. (Id.).

On May 17, 2016, Boyd was seen in chronic care clinic for his thyroid condition. (Doc. 13, ¶ 111; Doc. 14-1, p. 157). It was noted that Boyd was refusing all thyroid medication. (Id.).

On June 16, 2016, Boyd underwent an ultrasound of his thyroid, which revealed a single heterogeneous nodule that was decreased in size from the prior study, and considered to be benign. (Doc. 13, ¶ 112; Doc. 14-1, p. 367). On July 11, 2016, Boyd was again placed on Tapazole. (Doc. 13, ¶ 113; Doc. 14-1, p. 368).

## IV. Discussion

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials. See 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for

34

redness. . . .

*Id.; see also Gonzaga Univ. v. Doe,* 536 U.S. 273, 284-85 (2002); *Kneipp v. Tedder,* 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988).

## A. Deliberate Indifference to a Serious Medical Need

The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *See Estelle v. Gamble,* 429 U.S. 97, 103-05 (1976). In order to establish an Eighth Amendment medical claim, a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cty. Corr. Facility,* 318 F.3d 575, 582 (3d Cir. 2003) (citing *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir. 1999)). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." *Id.* (citation

35

omitted).

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. *See Farmer v. Carlson*, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988); *see also McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977); *Smart v. Villar*, 547 F.2d 112, 113 (10th Cir. 1976), *cert. denied*, 450 U.S. 1041 (1981).

Assuming *arguendo* that Boyd's thyroid condition represents a serious medical need, the Court must determine whether Boyd has shown genuine issues of fact for trial as to whether the defendants were deliberately indifferent to that need. The Court concludes that he has not.

## *1.    Failing to provide treatment for Boyd's thyroid condition*

Boyd alleges that Defendants refused to provide any treatment for his thyroid condition, other than prescribing Tapazole. (Doc. 1, p. 7, ¶ 19). The evidence demonstrates that Boyd received considerable medical attention from Defendants, and the

36

attention he received lacks the requisite deliberate indifference to support a § 1983 claim.

Boyd was diagnosed with hyperthyroidism in June 2012. Dr. Lisiak initially explained this diagnosis to Boyd, and advised him that he would undergo regular blood work and ultrasounds of the thyroid.

According to Boyd, he suffered several symptoms due to his thyroid imbalance. Boyd repeatedly reported weight loss, however the record reflects that his weight remained stable between 135 and 145 pounds. Boyd complained of difficulty with balance, heart palpitations, tremors, blood in his stool, excessive sweating, and shakiness. However, the record reflects that none of these symptoms occurred during examinations, and the clinicians never observed these symptoms. Boyd further complained of pain and discomfort in his neck. During numerous examinations of the neck, there were no palpable nodules.

The record reflects that Boyd underwent several medical tests and was continually monitored and treated for his thyroid condition. Eight ultrasounds of the thyroid were performed, which revealed a stable, benign thyroid nodule. Boyd underwent a thyroid uptake study and a biopsy of his thyroid, which was non-diagnostic for cancer. Additionally, Boyd was assigned to the chronic care clinic for his hyperthyroidism, and was treated in the chronic care clinic on eight occasions. He was treated by an oncologist/thyroid specialist on six occasions. Moreover, Boyd underwent lab work regularly to monitor his TSH levels. He was prescribed three different medications; namely, Propylthiouracil, Tapazole, and

Levothroid.

The evidence demonstrates that Boyd received extensive medical attention from Defendants. There is simply no evidence that Defendants failed to treat Boyd, or that they exhibited deliberate indifference to his medical needs. Boyd primarily appears to be dissatisfied with the medical care provided by Defendants. Boyd is not entitled to convert his dissatisfaction with that care into a constitutional claim. Boyd's personal opinions as to the manner in which a thyroid condition should be treated amounts to nothing more than a difference of opinion as to a course of treatment, which does not amount to a constitutionally cognizable claim. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) ("[M]ere disagreement as to the proper medical treatment" is insufficient to state an Eighth Amendment claim) (*citing Monmouth Cty.*, 834 F.2d at 346); *see also Norris v. Frame*, 585 F.2d 1183, 1186 (3d Cir. 1978) ("Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim."). Therefore, summary judgment must be granted in favor of Defendants on this claim.

## 2. *Failing to discontinue Boyd's prescription for Tapazole and replace the prescription with Levothroid after Boyd allegedly suffered an allergic reaction to Tapazole*

Boyd alleges that he was hospitalized in May 2014 due to an allergic reaction to Tapazole. (Doc. 1, p. 6). He further alleges that Defendants knew of his purported allergy to Tapazole, but nonetheless discontinued Levothroid and re-prescribed Tapazole. (*Id.*).

38

The evidence reflects that Boyd was transported to the Schuylkill Medical Center on May 2, 2014 due to an altered medical and mental state. (Doc. 14-1, p. 322). Once at the Schuylkill Medical Center, it was noted that Boyd had his eyes closed, his conversation was confused and rambling, and he was uncooperative with staff. (*Id.*). Boyd underwent a chest X-ray, CT and MRI of the head, and a thyroid ultrasound. (Doc. 14-1, pp. 321-329). On May 6, 2014, Dr. Purcell treated Boyd at the Schuylkill Medical Center. (Doc. 14-1, pp. 339- 344). In her treatment notes, Dr. Purcell never indicated that she believed Boyd had an allergic reaction to his thyroid medication. (*Id.*). Instead, Dr Purcell opined that Boyd's episode "could possibly be related to a seizure." (Doc. 14-1, p. 343). When Boyd was discharged from the Schuylkill Medical Center, he was diagnosed with altered mental status, schizoaffective disorder, hypertension, anxiety, depressive disorder, c-diff, and hypothyroidism. (Doc. 14-1, p. 345). The medical records do not suggest that the hospital believed that Boyd suffered from an allergic reaction to his hypertension medication. Notably, in the hospital discharge summary, Tapazole was not listed as an allergy. (Doc. 14-1, p. 363).

At this time, Boyd's medication was changed to Levothroid. The evidence reflects that Boyd was prescribed Levothroid because he had an episode of hypothyroidism, and Levothroid is used to treat hypothyroidism, whereas Tapazole is used to treat hyperthyroidism. (Doc. 14-1, p. 360). There is absolutely no evidence that Boyd was

39

prescribed Levothroid due to a concern of an allergy to Tapazole. (Doc. 14-1, p. 346). Once Boyd's TSH levels stabilized and lab work revealed a hyperthyroid state, Dr. Lisiak discontinued Levothroid and he was re-prescribed Tapazole. (*Id.*). Moreoever, the evidence reveals that Defendant Iannuzzi explained to Boyd on numerous occasions that Levothroid was prescribed for hypothyroidism, and that because Boyd suffered from hyperthyroidism, Levothroid was an inappropriate medication. (Doc. 14-1, pp. 186-87).

Boyd essentially sets forth a theory that he is allergic to Tapazole and therefore should be prescribed a different medication. In opposing Defendants' summary judgment motion, Boyd cannot rely on a theory. Rather, he must come forth with "affirmative evidence" in support of his right to relief. *Pappas v. City of Lebanon*, 331 F.Supp.2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e). Boyd has failed to meet his burden with respect to his claim that Defendants prescribed Tapazole despite their knowledge of his purported allergy to the medication. There is simply no evidence that Boyd was ever diagnosed with an allergy to Tapazole. The evidence establishes, during the brief time that Boyd's TSH levels increased to reveal hypothyroidism, he was appropriately prescribed Levothroid. Once Boyd's TSH levels revealed a hyperthyroid state, he was again prescribed hyperthyroid medication.

The evidence clearly demonstrates that Defendants were not deliberately indifferent to Boyd's serious medical need. By Boyd's own account, he received medical treatment

40

and medication for his thyroid condition. To the extent that Boyd is dissatisfied with the

medication prescribed to treat his hyperthyroidism, such claim, at best, demonstrates

Boyd's disagreement with medical treatment. Though he may have preferred a different

medication, such disagreement is not enough to state a § 1983 claim. *Spruill*, 372 F.3d at

235 (holding that "mere disagreement as to the proper medical treatment" is insufficient to

state a constitutional violation); *Gause v. Diguglielmo*, 339 F. App'x 132, 136 (3d Cir. 2009)

(a dispute over the choice of medication does not rise to the level of an Eighth Amendment

violation). This is particularly true in light of the fact that there is no evidence that

Defendants intentionally withheld medical treatment from Boyd in order to inflict pain or

harm upon him. *See Farmer*, 685 F. Supp. at 1339; *Rouse*, 182 F.3d at 197.

Consequently, Defendants are entitled to an entry of summary judgment in their favor on

this claim.

### 3. Failing to discontinue Tapazole and prescribe a comparable hyperthyroid medication, resulting in Boyd suffering from an alleged thyroid storm and heart attack

Boyd alleges that, due to Defendants' failure to prescribe Levothroid, he suffered a

thyroid storm and heart attack. (Doc. 1, p. 7, ¶ 20). On January 19, 2016, Boyd was

transferred to the Schuylkill Medical Center East due to complaints of chest pain and

shortness of breath. (Doc. 14-1, pp. 177, 302). Upon evaluation at the hospital, it was

determined that a cardiac enzyme was mildly elevated, and Boyd was transferred to

41

Geisinger Medical Center for a full cardiac work-up. (Doc. 14-1, p. 302). Once at

Geisinger, Boyd underwent an EKG that did not show ischemia. (Id.). Blood work revealed

that Boyd's cardiac enzyme levels were no longer elevated. (Id.). A cardiac catheterization

was performed and was unremarkable. (Id.). At discharge, Geisinger Medical Center

reported that Boyd was stable and pain free, his cardiac tests were negative, and he was

diagnosed with "chest pain – non-cardiac." (Doc. 14-1, pp. 178, 303). The record does not

indicate that Boyd's non-cardiac chest pain was the result of his hyperthyroidism or any

medications that he was taking for his thyroid. (Id.). There is simply no evidence to support

Boyd's allegations that he suffered from a thyroid storm or heart attack.

Inasmuch as Boyd disagrees with Defendants' decision to prescribe Tapazole and

Propylthiouracil, such disagreement does not rise to the level of an Eighth Amendment

violation. Boyd's claims amount to nothing more than his subjective disagreement with the

treatment decisions and medical judgment of the medical staff at the prison. See Carpenter

v. Kloptoski, No. 08-CV-2233, 2012 WL 983565, at \*6 (M.D. Pa. Mar. 22, 2012) (citing

White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990)) (observing that "a prisoner's

subjective dissatisfaction with his medical care does not in itself indicate deliberate

indifference"). Claims of medical malpractice and disagreements as to the proper course of

medical treatment simply do not suffice to satisfy the deliberate indifference standard. See

Monmouth Cty., 834 F.2d at 346. Courts will not second guess whether a particular course

42

of treatment is adequate or proper. *See Parham v. Johnson*, 126 F.3d 454, 458 n.7 (3d Cir. 1997) (quoting *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)). Therefore, Defendants are entitled to an entry of summary judgment in their favor on this claim.

## V.   Conclusion

Based on the foregoing, Defendants' motion (Doc. 12) for summary will be granted. A separate Order shall issue.

Date: August __/__, 2017

Robert D. Mariani
United States District Judge

43